Harry RIVKIN

v.

COUNTY OF MONTGOMERY, et al.

Civ. A. No. 92–6929.

United States District Court,
E.D. Pennsylvania.

March 18, 1994.

Michael H. Landis, and Ronald Smolow, Smolow & Landis, Trevose, PA, for Harry Rivkin.

William J. Bryers, Fleisher, Bryers & Bryers, Spring House, PA, for County of Montgomery, et al.

### MEMORANDUM

DALZELL, District Judge.

In this class action, on December 2, 1993 we granted plaintiff's motion for summary judgment and denied defendants' motion for summary judgment, for the reasons explained at length in our Memorandum of that day. 838 F.Supp. 1009 (E.D.Pa.1993). The defendants filed a motion for reconsideration which we denied on January 11, 1994. The Clerk of this Court entered that Order on the same day.

Defendants filed their Notice of Appeal on February 14, 1994, four days after the thirty-day appeal period expired.[1] The Clerk of the United States Court of Appeals for the Third Circuit on February 24 raised the obvious jurisdictional defect[2] *sua sponte.*

In response, on March 2, 1994, defendants filed in this Court a motion for an order extending the time to appeal "to and including February 14, 1994 on the grounds of excusable neglect" within the meaning of Fed.R.App.P. 4(a)(5).[3] Alternatively, defen-

---

1. Although in defendants' memorandum of law in support of the instant motion it is stated at ¶ 4 that the "deadline for filing the Notice of Appeal was Friday, February 11, 1994", it is clear that the deadline was February 10, 1994, a point defendants have now conceded. Defendants' filing of the motion for reconsideration made our resolution of that motion the relevant event for purposes of the appellate clock. *See* Fed. R.App.P. 4(a)(4).

2. *See* 28 U.S.C. § 2107(a) (notice of appeal must be "filed[ ] within thirty days after the entry of ... judgment, order or decree") and Fed. R.App.P. 4(a)(1) promulgated thereunder ("notice of appeal ... shall be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from"). The Supreme Court unanimously held in *Budinich v. Becton Dickinson and Co.,* 486 U.S. 196, 203, 108 S.Ct. 1717, 1722, 100 L.Ed.2d 178 (1988), that "the taking of an appeal within the prescribed time is mandatory and jurisdictional".

3. This rule provides, in relevant part,

   The district court, upon a showing of excusable neglect or good cause, may extend the time for filing a notice of appeal upon motion filed not later than 30 days after the expiration of the time prescribed by this Rule 4(a).

   It would seem clear that, even though a jurisdiction-divesting Notice of Appeal was filed, we

dants move under Fed.R.Civ.P. 60(b) "to vacate the Order of December 2, 1993 and re-enter the judgment so timely appeal can be filed." [4]

Plaintiff opposes defendants' motion. Plaintiff notes the fact that defendants sent their Notice of Appeal by ordinary mail "just two days before the appeal deadline expired", and that it "was improper for defendants to assume that the court would actually receive this notice in just two days." Plaintiff's Memorandum in Support of Plaintiffs' Answer to Defendants' Motion at the second (unnumbered) page. Plaintiff argues that Fed.R.Civ.P. 6(e) contemplates three days for service by ordinary mail, and thus defendants' assumption that two days was adequate could not be "excusable" within the meaning of either Fed.R.App.P. 4(a)(5) or Fed.R.Civ.P. 60(b)(1).

Because of apparent factual disputes between counsel as to the content of a conversation and, more importantly, what "normal" delivery time is for first class mail between defense counsel's office in Spring House, Pennsylvania, and the United States Courthouse in Philadelphia,[5] we held a hearing on March 17, 1994. We also afforded plaintiff the opportunity to take expedited discovery of the factual issues raised by defense counsel's affidavit.

The leading decision in this Circuit on this subject is *Consolidated Freightways Corporation of Delaware v. Larson*, 827 F.2d 916 (3d Cir.1987), *cert. denied* 484 U.S. 1032, 108 S.Ct. 762, 98 L.Ed.2d 775 (1988). Noting, at 827 F.2d 920, that the powerful "interest in finality must be balanced against the need to allow justice to take its course, and not have it thwarted by some minute technical error", the Court stated that "every case must be

examined on an ad hoc basis" with reference to five factors:

.  .  .  .  .

(1) whether the inadvertence reflects professional incompetence such as ignorance of the rules of procedure ...; (2) whether the asserted inadvertence reflects an easily manufactured excuse incapable of verification by the court ...; (3) whether the tardiness results from counsel's failure to provide for a readily foreseeable consequence ...; (4) whether the inadvertence reflects a complete lack of diligence ...; or (5) whether the court is satisfied that the inadvertence resulted despite counsel's substantial good faith efforts toward compliance. .

827 F.2d at 919 (citations omitted).

Given the *ad hoc* enterprise necessary to resolve these issues, we will first determine what, precisely, occurred here based upon the evidence adduced at the March 17 hearing. As will be seen, although we are loathe to prevent appellate review of the important public issues this case raises, we believe we are constrained on the balancing of the five *Consolidated Freightways* factors to deny defendants' motion. A contrast of the facts we have found in this case with those in *Consolidated Freightways* will confirm this conclusion after we have completed the assay our Court of Appeals requires.

At the March 17 hearing, defendants' counsel admitted that, contrary to the suggestion of ¶ 6 of his March 2, 1994 affidavit, he knew on February 8 that the deadline for filing a Notice of Appeal was two days later. According to the testimony of his secretary, she on February 8 transcribed a tape counsel had dictated of the Notice of Appeal and certificate of service. Later in the day, she

---

have jurisdiction under Fed.R.App.P. 4(a)(5) to make the initial resolution of this question. *See Sanchez v. Board of Regents of Texas Southern University*, 625 F.2d 521, 523–24 (5th Cir.1980). The "excusable neglect or good cause" language also appears in the enabling time for appeals statute, 28 U.S.C. § 2107(c).

**4.** Defendants' alternative prayer is necessarily predicated on the first ground provided in Rule 60(b), which states:

On motion and upon such terms as are just, the court may relieve a party or party's legal

representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect....

**5.** Such an inquiry about Postal Service normality seemed to us required in view of the teaching of our Court of Appeals in *Ramseur v. Beyer*, 921 F.2d 504, 506 (3d Cir.1990) that we should look to "the normal course of events" to determine whether, here, counsel could on February 8, 1994, reasonably have expected delivery of first class mail in two days.

asked counsel whether she should do a transmittal letter, and then typed one when told to do so. Surprisingly, at no time on February 8 or later did counsel ever mention to his secretary the importance of, or the imminent deadline for, the Notice of Appeal.

As she left work between 4:15 and 4:30 p.m. on February 8, the secretary dropped the envelope, with first class postage on it, in the mailbox outside the office complex in Spring House, Pennsylvania. She never saw a Postal Service truck pick up the mail that day, and never called the Postal Service to ask if, in fact, the mail was collected late that afternoon. According to the secretary, counsel never thereafter asked her about the mailing of the Notice of Appeal. Indeed, the parties stipulated that defendants' counsel

> did not call the U.S. District court clerk or instruct anyone in his office to call the U.S. District court clerk to determine if and when the Notice of Appeal had been actually received by the clerk and similarly did not go to the clerk's office or instruct someone to go to the clerk's office to check to see if and when the Notice of Appeal was actually received by the U.S. District court clerk[.]

*See also* transcript of deposition of Norma N. Gunning at 18–19.

Although at the hearing defendants' counsel stated that his mail to the United States Courthouse normally arrives in a day or two, he also acknowledged that he himself never mailed such documents, but rather entrusted them to his secretary. The secretary's testimony at her deposition, which she confirmed at the hearing, was more equivocal on this point:

> Q. What is the normal time for mail delivery between [defendants' counsel's office] and the U.S. Courthouse in Philadelphia; do you know?
>
> A. No. I've sent stuff there in the past, but I don't know when they actually receive them.

Dep. transcript at 17.

While we do not see any evidence of "professional incompetence such as ignorance of the rules of procedure"[6] and are not inclined to find "an easily manufactured excuse incapable of verification by the Court",[7] we are troubled by "counsel's failure to provide for a readily foreseeable consequence" that seems to us to reflect "a complete lack of diligence" that is not the consequence of "counsel's substantial good faith efforts toward compliance." We do not see how we could hold counsel's (unwarranted) assumptions of two days delivery to be reasonable or "excusable" when the Federal Rules of Civil Procedure have since the Supreme Court first approved them in 1937[8] allowed three days additional time whenever a "notice or paper is served upon the party by mail". Fed.R.Civ.P. 6(e).[9] *See also* Local Rule of Civil Procedure 20(c), referencing this three day postal allowance period. If the Federal Rules of Civil Procedure have since their inception deemed that

---

**6.** Defendants' counsel is an experienced practitioner, having been admitted to the bar in 1980. A database search reveals that he has participated in at least three other cases in this District between 1986 and 1993.

**7.** Of course, claims of first class mailing are necessarily incapable of independent verification. Here, for example, neither the parties nor we will ever know if, in fact, the mail was collected that February 8 afternoon or evening.

**8.** *See* the Supreme Court's Order of December 20, 1937, 302 U.S. 783 (Brandeis, J., dissenting). *See also* 2 United States Code p. 2614 (1940 ed.).

**9.** Rule 6(e) has not changed since 1937. The Advisory Committee's official commentary on the original Rule omitted any reference to why the three day time period was chosen, and we have been unable, despite the persistent efforts of the Third Circuit Library's Reference Librarian, to find any rationale in any other record of the original Advisory Committee. It would seem that reasonable minds can differ on whether ordinary mail is faster or slower in 1994 than it was in 1937. In the sense that it ultimately relies on the physical carriage by a human to an addressee, mail delivery will always bear a resemblance to the methods developed in the time of Thurn and Taxis, and thus be subject to inherent temporal limits imposed by this timeless physical constraint. While transportation in 1994 is obviously much faster than it was in 1937, postal volume is much higher with the advent, among other things, of the junk mail so ubiquitous in recent years. Of course, in 1937 there were morning *and* afternoon deliveries of mail, a practice that died out in the 1950's. On balance, therefore, we conclude that these factors suggest that little change has occurred in delivery time since 1937, which may explain why Rule 6(e) has never been amended.

three days is the appropriate time to allow for service by mail, we cannot conclude that less time could constitute the requisite diligence "to provide for a readily foreseeable consequence".[10]

We are fortified in this conclusion by the recognition that defendants had, in practical terms, since December 2, 1993 to contemplate the possibility of appellate review.[11] Thus, when the motion for reconsideration was denied on January 11, 1994, counsel and his clients already had forty days to consider the likelihood that we would adhere to our original decision. Once that possibility became reality, counsel had an additional thirty days that his *pro forma* motion for reconsideration had purchased for him and his clients. Under the circumstances, and given that counsel's office is in Spring House,

Pennsylvania, in the suburbs of Philadelphia, there certainly was no reason for him "in good faith" to expect that the mails would be swifter than what the Federal Rules of Civil Procedure have for fifty-six years assumed. Without question, mid-winter of 1994 would have been the most unlikely time for him to harbor such an optimistic expectation.[12]

Further, lawyers who represent appellants, finding themselves near a deadline of jurisdictional consequence, today have many options available to them. Electronic mail filing is, of course, instantaneous.[13] Prompt physical delivery options abound. For example, express delivery can be purchased for a modest cost from the Postal Service or from private firms such as Federal Express for only a few dollars more.[14] When defendants' counsel learned that we had on January 11,

10. As we stated to counsel at the hearing, anecdotes about mail delivery are, ultimately, inconclusive on the point at issue. No one proffered a study by any competent Postal Service representative, or outside expert, that would be admissible as duly-qualified statistical evidence of delivery time. Thus, as counsel agreed at the hearing, the informal comments of a postal employee of unknown qualifications, and without any cited statistical support (Exhibit 2), is worth no more than this Court's own experience in regularly waiting two days for first class letters to be received by lawyers eight blocks from the courthouse. Thus, we believe our analysis is on much firmer and more reliable ground when it rests on something less vaporous than anecdote.

11. Indeed, ¶ 5 of our December 2, 1993 Order specifically alerted the defendants to consider an appeal when we stayed the declaratory parts of the Order "until the later of thirty-one days from the entry of this Order or final appellate review of its propriety."

12. Since this memorandum will be read after winter's end, it is well to record the harshness of the season known to every inhabitant of this District. From the time of the ice storm of January 7, 1994 through the winter's fifteenth storm on March 3, this Court was unable to conduct business on three days, an experience unknown in the thirty-two years our Clerk of Court has been on duty for this Court. This part of Pennsylvania saw road conditions so difficult during that time that they resulted in thirteen days' public school closings in Philadelphia. In places like Spring House the weather was worse than in Philadelphia. Such conditions would not have led any reasonable adult in Eastern Pennsylvania to conclude that mail delivery would be speedier than it is in more benign seasons. *See, e.g.,* "Post Office Gets Tweaked Over Promise It

Didn't Make," *The Philadelphia Inquirer,* January 8, 1994, A4 ("[S]pokesman notes that ice is not included in motto promising that 'neither snow, nor rain, nor heat, nor gloom of night' will stop postal carriers").

13. This Court is one of two districts participating in a pilot project on electronic filing. The project is being conducted under the aegis of the Federal Judicial Center, which, in turn, is acting pursuant to the 1989 authorization of the Judicial Conference and its then-named Committee on Judicial Improvements. The Board of Judges of this Court on March 13, 1989 authorized the Clerk to accept filings by electronic means, and on May 26, 1992 specified that "Complaints, Notices of Removal and Notices of Appeal may be filed electronically with the usage of a Visa or Mastercard credit card, to pay the filing fee." Pursuant to this later action, lawyers who participate in the program are required to maintain on file with the Clerk "one signature form in order to comply with the provisions of Rule 11 of the Federal Rules of Civil Procedure." Many lawyers in this District now participate in this program, and daily avail themselves of its obvious convenience. They pay no service fee for using the system.

14. Postal Service Express Mail, which guarantees next day delivery, costs $9.95. Postal Service Priority Mail, with two-day delivery not guaranteed, costs $2.90. Domestic Postal Rates and Fees at 2 and 4 (U.S. Postal Service Notice 59, July, 1991). Federal Express delivery for the next business day costs $11.50. Egbert Messenger Services advises us that its charge for same day hand delivery from Spring House to the Courthouse would be $32.00. Defense counsel's secretary testified on March 17 that she sometimes uses Federal Express or courier services.

1994 adhered to our December 2, 1993 decision, he chose not to take advantage of any of these options. In the face of these cheap delivery alternatives, we cannot conclude that counsel made "substantial good faith efforts towards compliance" with a jurisdictional deadline when two days before that deadline he entrusted his clients' appellate fortunes to a twenty-nine cent stamp.

In short, what is presented here was not the unquestionably inadvertent clerical error that the Court of Appeals excused in *Consolidated Freightways*. No one mistyped an address or identification of a court. Everything appeared and happened precisely as counsel intended, except that, rather than spend $2.90 for United States Postal Service Priority Mail that would likely have assured delivery within two days,[15] he decided to spend twenty-nine cents instead. There was, in short, nothing "inadvertent" about counsel's actions or about the phlegmatic approach he took to the jurisdictional deadline facing him.

In the final analysis, the question here is who should bear the jurisdictional risk of counsel's election to use twenty-nine cents postage instead of $2.90. It seems to us that the least likely answer to this question should be the Court of Appeals or, secondarily, the appellee. At a time when appellants have available to them a wide variety of inexpensive delivery options for more reliable service than the often-maligned first class letter, it strikes us as a surprising decision at best that appellants' counsel would choose the false economy he made in this case. In our view, neither the Court of Appeals nor appellee should pay a much higher price because counsel paid the lowest one.

We therefore reluctantly conclude that we have no alternative but to deny defendants' motion.[16]

**15.** Although the Postal Service does not guarantee second day delivery with Priority Mail, it unquestionably represents "the normal course of events", *Ramseur supra* note 5, for Priority Mail to be delivered in two days.

**16.** Since Fed.R.Civ.P. 60(b)(1) and Fed.R.App.P. 4(a)(5) both use the term "excusable neglect", it

### ORDER

AND NOW, this 18th day of March, 1994, upon consideration of defendants' motion to extend the time to appeal, and plaintiff's opposition thereto, and after an evidentiary hearing and for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that defendants' motion is DENIED.

would seem that the analysis under Rule 60(b)(1) would be identical to that under the Federal Rules of Appellate Procedure. No one has brought any authority to our attention that would lead us to conclude otherwise. In any event, there was, as we have shown, no "inadvertence" or "neglect", excusable or not, that would permit us to grant relief under Rule 60(b)(1).